No. 15-55446

————————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

————————————

AMERICANS FOR PROSPERITY FOUNDATION,
Plaintiff-Appellee,

v.

KAMALA HARRIS,
in her official capacity as the Attorney General of California,
Defendant-Appellant.

————————————

On Appeal from the United States District Court
for the Central District of California
Case No. 2:14-cv-09448-R-FFM

————————————

**DECLARATION SUPPORTING RESPONSE OF PLAINTIFF-APPELLEE
TO DEFENDANT-APPELLANT'S MOTION
TO STAY TRIAL PROCEEDINGS PENDING APPEAL**

————————————

| | |
|---|---|
| Harold A. Barza | Derek L. Shaffer |
| Carolyn Homer Thomas | William A. Burck |
| 865 S. Figueroa St., 10th Floor | Jonathan G. Cooper |
| Los Angeles, CA 90017 | 777 Sixth St. NW, 11th Floor |
| (213) 443-3000 | Washington, DC 20001 |
| | (202) 538-8000 |

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

*Counsel for Plaintiff-Appellee*
*Americans for Prosperity Foundation*

I, Derek L. Shaffer, declare as follows:

1.     I am a Partner at Quinn Emanuel Urquhart & Sullivan, LLP and counsel for Plaintiff-Appellee Americans for Prosperity Foundation.  I submit this declaration in support of the Response of Plaintiff-Appellee to Defendant-Appellant's Motion to Stay Trial Proceedings Pending Appeal.  I am competent to testify to the matters in this declaration, and, if called, would so testify.

2.     Attached as **Exhibit 1** is a true copy of excerpts of the November 3, 2015, deposition of Ms. Kevis Foley, the recently retired Registrar of Charitable Trusts for the Attorney General's Office of the California Department of Justice.  Ms. Foley was designated as the Attorney General's 30(b)(6) witness regarding the Attorney General's policy surrounding Schedule B, including as to confidentiality.

3.     Attached as **Exhibit 2** is a true copy of excerpts of the October 29, 2015, deposition of Mr. Steve Bauman, a supervising investigative auditor for the Attorney General's Office of the California Department of Justice.  Mr. Bauman was designated as the Attorney General's 30(b)(6) witness regarding the Attorney General's use of Schedule B for purposes of regulatory enforcement.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 5, 2015, in Washington, D.C.

*/s/ Derek L. Shaffer*
Derek L. Shaffer

*Counsel for Plaintiff-Appellee*
*Americans for Prosperity Foundation*

# EXHIBIT 1

1

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


--------------------------------x

AMERICANS FOR PROSPERITY
FOUNDATION,

        Plaintiff,

     v.

KAMALA HARRIS, in her Official
Capacity as Attorney General of
the State of California,

        Defendant.

--------------------------------x

VIDEOTAPED DEPOSITION OF

KEVIS FOLEY

VIDEOTAPED 30(B)(6) DEPOSITION OF KAMALA HARRIS

Sacramento, California

November 3, 2015

9:30 a.m.




Reported by:
WENDY E. ARLEN
Job No:  41421

KEVIS FOLEY

2

1

2

3                         Kevis Foley

4                    November 3, 2015

5                        9:30 a.m.

6

7

8

9

10        Videotaped deposition of KEVIS FOLEY,

11        individually and as a 30(b)(6) witness, held

12        at the offices of DOWNEY BRAND, 621 Capitol

13        Mall, 18th Floor, Sacramento, California,

14        pursuant to Notice, before WENDY E. ARLEN,

15        CSR 4355, RMR, CRR within and for the State

16        of California.

17

18

19

20

21

22

23

24

25

KEVIS FOLEY

3

1

2    A P P E A R A N C E S

3

4    FOR THE PLAINTIFF:

5            QUINN EMANUEL

6            777 Sixth Street NW, 11th Floor

7            Washington, DC  20001

8            202.538.8000

9            By:    Derek Shaffer, Esq.

10                   derekshaffer@quinnemanuel.com

11

12            QUINN EMANUEL

13            555 Twin Dolphin Drive, 5th Floor

14            Redwood Shores, California  94065

15            650.801.5136

16            By:    Carolyn Thomas, Esq.

17                   carolynthomas@quinnemanuel.com

18

19

20

21

22

23

24

25

KEVIS FOLEY

4

1

2    A P P E A R A N C E S (Cont'd)

3

4    FOR THE DEFENDANT:

5            DEPARTMENT OF JUSTICE

6            OFFICE OF THE ATTORNEY

7            455 Golden Gate Avenue, Suite 11000

8            San Francisco, California  94102-7004

9            415.703.5509

10           By:    Alexandra Robert Gordon, Esq.

11                   alexandra.robertgordon@doj.ca.gov

12

13           DEPARTMENT OF JUSTICE

14           OFFICE OF THE ATTORNEY

15           CIVIL DIVISION

16           1300 I Street

17           Sacramento, California  95814

18           916.322.6114

19           By:    Kevin A. Calia, Esq.

20                   kevin.calia@doj.ca.gov

21

22    ALSO PRESENT:

23            Matt Miller, Videographer

24

25

KEVIS FOLEY

136

Q.      Do you have a sense of how many students came
through the Registry over the course of time that you
were there, the ten years you were there?

A.      I don't know.  I would say at least 50.  That
would be an estimate.

Q.      Did you ever alert the Beyond Baroque
Foundation yourself or do you know of anyone from the
Registry alerting the Beyond Baroque Foundation to
the fact that their Schedule B for 2009 had been
inadvertently posted on the Web site?

A.      No.

Q.      When we look back at your response to
Interrogatory 18 that we were looking at on
Exhibit 15, were you conscious of the fact that there
were other instances beyond those two where a
Schedule B that ought to have been confidential was
in fact inadvertently posted on the public Web site
for whatever period of time?

A.      Only in the general sense that I know I had
to fix them, but I couldn't tell you who they were
or -- you know what I mean?  It was like part of the
daily -- of the daily work.  I wouldn't make a note
of it.  It was not a, you know --

        These were -- I believe these were the only
two we could actually pin down and had some sort of

KEVIS FOLEY

137

1   documentation on them.

2   Q.      I take it for the other instances you did not

3   alert the other charities that their Schedule B's had

4   inadvertently been posted on the Web site for

5   whatever period of time.

6   A.      No.

7   Q.      You had not done so, correct?

8   A.      No.

9   Q.      Let me, if I could, show you what we'll mark

10  as the next numbered exhibit.

11          (Deposition Exhibit 38 marked for

12          identification.)

13  Q.      MR. SHAFFER:  Am I correct that this is a

14  listing of the individuals at whatever point in time

15  who were within the Registry and authorized to have

16  access to Schedule B's?

17  A.      Yes.

18  Q.      Do you know what snapshot in time this was

19  taken at?

20  A.      Oh, let's see.  It's fairly recently because

21  most of these people -- there's a couple that are

22  gone now that were here, you know, when I left.  So I

23  would say it was probably -- I'm not sure.  Within

24  the last -- within 2015 whenever we submitted the

25  information as part of your interrogatories.

KEVIS FOLEY

138

1   Q.     Was there any system by way of a log or

2   otherwise for determining who had -- basically had

3   access to or checked out a particular confidential

4   Schedule B at a particular point in time?

5   A.     Well, I'm not sure what you mean by checked

6   out. We don't check out. I mean, anyone that had

7   access to the system could look on the record and

8   look at the documents on the record, but there is no

9   like -- if someone went to view it on there, there is

10   no kind of log of that. It doesn't do that kind of

11   audit.

12   Q.     Is there any limitation on someone

13   downloading the Schedule B?

14   A.     If they did what?

15   Q.     Downloading. Downloading the Schedule B,

16   someone within the Registry.

17   A.     You mean like opened it up and saved a file

18   onto their desktop?

19   Q.     Correct.

20   A.     No.

21   Q.     Is there any limitation to them printing a

22   hard copy?

23   A.     No, not for internal staff.

24   Q.     Is there any limitation on how they treat and

25   dispose of a hard copy once it's been printed?

KEVIS FOLEY

139

1    A.     Yes, we have shred boxes all around the

2    Registry for confidential information.

3    Q.     But how would you make sure that a particular

4    hard copy once printed was in fact put in a shred box

5    as opposed to carried out of the office in a

6    suitcase?

7    A.     We wouldn't.  I mean, I don't know of any

8    particular -- we don't have any -- no one gets

9    frisked when they walk out the door and leave work,

10    if that's what you're asking.

11    Q.     I'm asking something else.  Were there

12    instructions given to people that they were not

13    permitted to take a hard copy of a Schedule B outside

14    the Registry with them?

15    A.     Well, yes.  They're not take to take any

16    information outside of the Registry that they work on

17    in the Registry.  All documents stay in -- stay in

18    the Registry office.

19    Q.     Where is that memorialized?

20    A.     Pardon?

21    Q.     Where is that memorialized?

22    A.     It's part of their training.  They sign

23    confidentiality agreements when they all start

24    working.

25    Q.     I'm sorry.  I haven't seen any

KEVIS FOLEY

140

1    confidentiality agreements that specify they cannot

2    take documents to work from home, for instance.  Is

3    there any specification?

4    A.        I don't know.  I don't think there's anything

5    written in like our office procedures.  Not that I

6    can think of.  I would have to go back through our,

7    you know, procedures, but there is no reason for

8    anyone to take any documents home to work.  All the

9    work is done in the office.

10   Q.        Well, what would prevent, say, an auditor

11   from taking a Schedule B with him into the field or

12   into another office?

13            MS. GORDON:  Objection, calls for

14   speculation.

15            THE WITNESS:  I can't speak to what the

16   auditors do.  They're not in my office.

17   Q.        MR. SHAFFER:  Do you know of anything that

18   would prevent the auditor from taking a hard copy

19   with them outside of the Registry?

20   A.        They don't come to the Registry.  They have

21   access to the system in their computers, and we don't

22   have auditors that work in the Registry.

23   Q.        Do you know of anything that would prevent

24   them from taking the Schedule B with them in the

25   world wherever they may go?

KEVIS FOLEY

141

1    A.        No.

2    Q.        Did you ever provide any instructions to any

3    auditor that the Schedule B needed to be treated as

4    confidential by them?

5    A.        Some of them -- well, I can't say for -- I

6    don't do the training for the auditors.  Their senior

7    assistant Attorney Generals would have trained them

8    about confidentiality of the documents.  So I can't

9    say -- I didn't personally tell them these are

10   confidential.  They -- I would have to say they know

11   that.  It's part of their training that they received

12   in the office.

13   Q.        But if they say they didn't get that

14   training, you're not in any position to contradict

15   them, are you?

16   A.        That would be correct.

17   Q.        And did you ever speak to the person who is

18   responsible for their training to ask whether they

19   were being trained in the confidentiality of Schedule

20   B's?

21   A.        Not specifically, no.

22   Q.        Did anyone from your office ever ask that

23   specifically and report to you about it?

24   A.        I'm not sure.  Anyone in the office, like

25   someone that works for me asked whether the auditors

KEVIS FOLEY

142

1    have been trained?  Is that what you're saying?

2    Q.      Correct.  Did they ever indicate to you that

3    they had undertaken an inquiry into that question and

4    obtained an answer one way or the other?

5    A.      Not that I recall.

6    Q.      Did you ever ask an auditor, Have you been

7    trained in the confidentiality of the Schedule B's?

8    A.      I don't believe I -- not to my recollection.

9    It's not to say I never did, but not that I recall.

10   Q.      What prevents someone else from the Attorney

11   General's office from coming to the Registry and

12   asking to review a Schedule B, if anything?

13   A.      Well, the doors to the Registry have

14   separate -- are separately secured.  The regular

15   doors are not in the office.  The badge access is

16   only -- the Registry is only accessible to Registry

17   staff.

18           So they would have to have knocked on the

19   door and asked to get in.  I've never had anyone do

20   that trying to look at Schedule B's that didn't --

21   didn't work in the Registry.

22   Q.      Well, have you ever had someone who didn't

23   work in the Registry come into the Registry and want

24   to be inside the Registry?  Has that ever happened?

25   A.      Well, sure.  I mean, there's been -- we have

KEVIS FOLEY

202

1   Schedule B information.

2   A.      That's correct.

3   Q.      Do you know of them ever doing a specific

4   cyber security audit of the Registry?

5   A.      Not of the Registry.  Our servers are housed

6   in the same place all the criminal ones are.  So they

7   would all be done by them.

8   Q.      Do you know of any specific audit that

9   extended to the information that the Registry is

10  uploading to the backend of its database or to the

11  public Web site?

12  A.      Not specific.  You would have to ask them

13  again.  I don't know.  They are auditing and doing

14  security improvements all the time.

15  Q.      When you say all the time, you don't mean

16  literally all the time.

17  A.      All the time.  I mean every day.

18  Q.      Every day.

19  A.      Every minute probably.

20  Q.      And what is that based on?

21  A.      Based on just e-mails that come out from them

22  about what they're doing, upgrades to the security,

23  you know, just from knowing what they do over at the

24  data center.

25  Q.      And your sworn testimony is their account of

KEVIS FOLEY

203

1  it is they're doing it literally every minute?

2  A.     I would not swear that in my testimony.  Just

3  from what I've seen it's an ongoing event.  That's

4  their job.

5         MR. SHAFFER:  Let me show you what we'll mark

6  as Exhibit 55 to today's deposition.

7            (Deposition Exhibit 55 marked for

8            identification.)

9  Q.     MR. SHAFFER:  Do you recognize this document,

10  Ms. Foley?

11  A.     Yes.

12  Q.     Am I correct that that's basically -- well,

13  let me refer to it by its title.  It's, as I

14  understand, the "Incompatibility Statement of the

15  Department of Justice"; is that correct?

16  A.     Yes.

17  Q.     This extends throughout the California

18  Department of Justice?

19  A.     As far as I know, yes.

20  Q.     Is this provided to individual personnel at

21  the Registry?

22  A.     Yes.

23  Q.     When they start essentially?

24  A.     Yes.

25  Q.     And am I correct that if you turn to the

KEVIS FOLEY

204

1    second page, number 8 -- let me just read it into the

2    record in its entirety.

3            "Divulging confidential information,

4            data, or records of the Department of

5            Justice, to any person to whom issuance of

6            such information, data, or records has not

7            been authorized, or divulging or making use

8            of any records of the Department of Justice

9            for a mailing list or for any other purpose

10           without proper authorization."

11           And that's among the prohibited activities,

12   correct?

13   A.      Yes.

14   Q.      You understand that to extend to the

15   divulging of a Schedule B?

16   A.      Yes.

17   Q.      Does it extend to the inadvertent divulging

18   of a Schedule B?

19   A.      I don't know.

20   Q.      Have you ever obtained anyone's opinion on

21   that?

22   A.      No.

23   Q.      Do you know of any consequence for a

24   violation of the provision that we were just looking

25   at, provision 8 or any of the other provisions?

KEVIS FOLEY

205

1   A.      Consequences?  Could be state disciplinary

2   process through the department if it was -- depending

3   on what the violation was and whether it was

4   repetitive, how serious it was.  I've never

5   personally dung anyone on that.  So...

6   Q.      Do you know of anyone being dung on it by

7   anyone?

8   A.      No, not offhand.

9   Q.      Do you know of anyplace where it's written

10  down what the penalties would be for violation of one

11  of these prohibitions?

12  A.      I do not off the top of my head.  It's

13  possible it's in -- the department's got a lot of

14  procedures and policies and how they're implemented.

15  Probably in there somewhere.

16  Q.      You don't recall reviewing that in your time

17  at the Registry.

18  A.      No.

19  Q.      You don't recall providing that to anyone in

20  your time at the Registry.

21  A.      No, only in -- no, not really, no.

22  Q.      Now, apart from what we reviewed in terms of

23  the confidentiality policy and the training documents

24  we looked at on that, do you know of any other

25  memorialization of what the do's and don't's or

KEVIS FOLEY

206

1    penalties are associated with Schedule B

2    confidentiality policy?

3    A.       You mean for violations of it or the policy

4    itself?

5    Q.       Let's break it out.  As to the policy itself,

6    the contours of it, the application of it, the

7    implementation of it, do you know of any piece of

8    paper beyond what we've reviewed today?  Can you

9    think of any?

10   A.       No, other than there could be occasional

11   e-mails directly to a staff person, but, I mean, off

12   the top of my head, I can't think of one.

13   Q.       In terms of how individual employees need to

14   comply with the confidentiality policy, what they can

15   and cannot do consistent with that, do you know of

16   anyplace where that is written down outside of the

17   training procedures that we looked at today?

18   A.       No, not off the top of my head.

19   Q.       In terms of what the theoretical or actual

20   penalties are for violating the confidentiality

21   policy, do you know of anyplace where that is written

22   down?

23   A.       Again, not off the top of my head.

24   Q.       Do you recall having seen any document like

25   that that says if you violate the confidentiality

KEVIS FOLEY

207

```
 1   policy you may be subject to the following penalties?
 2   A.      I believe there is one somewhere.  I just --
 3   I can't think of where it is off the top of my head.
 4   So it's probably in another one of the forms that we
 5   sign when we -- when they hire people.
 6   Q.      You didn't create any such document, did you?
 7   A.      I didn't create.  I'm not the one that gets
 8   the employees to sign it.  So...
 9   Q.      You didn't revise any such document, did you?
10   A.      No.
11   Q.      You didn't disseminate any such document, did
12   you?
13   A.      No.
14   Q.      Let me, if I could, get you to walk us
15   through the Registry Web site itself, the public
16   facing Web site, so that we can understand how that
17   operates in practice.  To do that, we may need to
18   employ some technology that will project onto the
19   screen what we have on the computer from the Web
20   site.
21   A.      Okay.
22           MR. SHAFFER:  I tell everyone Ms. Thomas is
23   always indispensable to me, but never more so than
24   right now.  She'll be our navigator through this.
25   Q.      But am I correct, Ms. Foley, that what we're
```

KEVIS FOLEY

208

1    looking at now is the home page basically of the

2    Registry's Registry, the publicly available, public

3    facing Web site where you can search the publicly

4    available documents?

5    A.      This is the home page for the verification.

6    It's not what I would consider the home page for the

7    charities Web sites.

8    Q.      Okay.  I appreciate that.  It's the home page

9    for the verification, and I take it what you mean by

10   that is this is where members of the public can go to

11   review the specific documents to verify the bona

12   fides of a particular charity.

13   A.      Yes.

14   Q.      And am I correct that those are all different

15   search mechanisms that the member of the public can

16   use to enter the Web site to get information on a

17   particular charity?

18   A.      Yes.

19   Q.      So for illustration, why don't we just look

20   at Americans for Prosperity.  There we go.  The

21   search takes a little while.

22   A.      Only if you search by name.  If you search by

23   a number, it's fast.

24   Q.      And that would be the registration number,

25   that's the fastest way to search?

KEVIS FOLEY

213

1  A.      Okay.  I believe you.

2  Q.      Now, how did you say we'd be able to know if

3  there was a delinquency for 2006?

4  A.      Well, the whole record would be delinquent.

5  So up here there's a status.  It says registration

6  status is delinquent.

7  Q.      And my only point, I guess, is, and I just

8  want to confirm it, that won't differentiate whether

9  the delinquency comes from, whether it's the 2006

10  year as opposed to the 2013.

11  A.      That's correct.  You would have to look --

12  what else is on this page that -- see, there's no

13  annual -- I don't see any annual renewal information.

14  There should be another box that's not showing.

15  Q.      Annual renewal?

16  A.      Yeah, that would be the information from the

17  RRF's and you can see which years was filed and which

18  were not accepted.  It looks like -- because these

19  people have not filed anything since two thousand --

20  look down here.  Yeah, there should be information on

21  the RRF panel.  I don't know why there's none of it

22  showing up there.

23  Q.      I'm sorry.  The RRF panel.

24  A.      Yeah.  Well, go back up where it says -- see

25  that little black line that says annual renewal

KEVIS FOLEY

214

1    information?

2    Q.       Yeah.

3    A.       There should be a whole block of information

4    in there for each year's filing.

5    Q.       Could that be a function of the fact that

6    there is this delinquency, according to the Registry

7    and --

8    A.       No.

9    Q.       -- information is still outstanding?

10   A.       No, it should show up on there.  I don't know

11   why it's not.

12   Q.       Now, have you ever yourself gone through the

13   Web site to see if you can find confidential Schedule

14   B's that are available through the Web site?

15   A.       No.

16   Q.       Have you ever asked someone to do that?

17   A.       Have I ever what?

18   Q.       Asked someone to do that.

19   A.       No, I don't even know -- you mean just

20   randomly put in numbers and put in their documents --

21   we don't have time to sit around doing that.

22   Q.       Well, have you ever asked anyone to spend an

23   hour just to see if they find any Schedule B's on

24   there that shouldn't be on there?

25   A.       No.

215

1    Q.      Well, would you be concerned if it turned out

2    that one such Schedule B was on the Web site that was

3    meant to be kept confidential?

4    A.      Would I be surprised?  No, I would be

5    disconcerted, but it wouldn't surprise me.  If you

6    searched all, you know, 600,000 documents, it's

7    possible there's one out there that shouldn't be

8    public.

9    Q.      What if you found a dozen?  Would that be

10   surprising or concerning to you?

11   A.      Again, I would have to look at the individual

12   cases and see what they were, how old they were, what

13   they were from.

14   Q.      If there were hundreds of them.

15   A.      Hundreds I might be concerned about.

16   Q.      If there was well upwards of a thousand,

17   would you be concerned about that?

18   A.      Yes.

19   Q.      Let me offer to you what I will represent to

20   you and to counsel is not an exhaustive sampling, but

21   through the best means available to us in part to

22   search through the actual documents without looking

23   at what we consider to be and we understand

24   California says it treats as confidential Schedule B

25   information, we through a team of attorneys who spent

216

no more than seconds looking at what appeared to be
unredacted Schedule B's that were improperly posted
in violation of the confidentiality policies.  There
was no scrutiny of individual names and addresses,
just enough to determine that, yes, indeed, these are
confidential Schedule B's that are on the Web site in
violation of the policy.

I don't expect you to testify to that,
Ms. Foley.  I'm going to pass you the document that
we have reflecting more than 1400 such instances.
I'd ask that it be marked as the next numbered
exhibit, and so that we don't all stay here all past
when we want to be here, I would ask you, Ms. Foley,
to pick out of there at random just a few of these
charities.  We'll go look at them and whatever the
fastest way possible is, and we will very briefly
gaze upon them to see if in fact these are unredacted
Schedule B's that are available publicly on the Web
site in violation of the confidentiality policy.

THE WITNESS:  Okay.

MS. GORDON:  I will just reserve the right
obviously to find out what your methodology is to
authenticate this to find out the foundation for
this, et cetera.

MR. SHAFFER:  That's fine.  It's the witness

KEVIS FOLEY

219

1    A.       Yes.

2    Q.       Okay.  We've reached individual donor names

3    and addresses and amounts.

4    A.       Yes.

5    Q.       Again, we found a document that is on the Web

6    site today in violation of the confidentiality policy

7    as you have testified to it, correct?

8    A.       Yes.

9    Q.       Do you want to keep going, Ms. Foley?

10   A.       Not really.  I mean, we can if you want.

11   Q.       Well, you tell me.  Are you convinced now

12   that there is cause for you as the former Registrar

13   of the Registry and the Attorney General's 30(b)(6)

14   designee to be deeply concerned about the Registry's

15   failure to maintain confidentiality to which the

16   Schedule B's are entitled?

17   A.       Well, again, when you look at the scope, I

18   don't know how many there are here, but if you

19   compared it to how many records are out there, I

20   guess I would be somewhat -- I am somewhat concerned.

21   But, again, percentagewise I still think it would be

22   a very tiny percent.

23   Q.       Close enough for horseshoes, is that your

24   testimony?

25           MS. GORDON:  Objection, argumentative.

KEVIS FOLEY

220

1     THE WITNESS:  I don't know what that means.

2   So...

3   Q.     MR. SHAFFER:  Ms. Foley, you're looking at a

4   document that is 87 pages long, correct?

5   A.     Yes.

6   Q.     It has about 17 entries on each of those

7   pages, correct?

8   A.     If you say so, yes.

9   Q.     We're looking at a number that's above 1400,

10  correct?  You can run some math on a calculator.

11  A.     I believe your math is correct.  1400 out of

12  600, 700, a million records, I still think that's a

13  pretty small percent, in my view.

14  Q.     You consider this consistent with the sworn

15  testimony that you've offered through three

16  declarations and throughout today's testimony.

17  A.     Well, to the best of my knowledge, I didn't

18  know about all these, so, yes.  I was surprised that

19  there is this many.  I need to hire your programmer

20  that was able to identify to help us identify them.

21  Or not me personally anymore since I don't work there

22  anymore.

23  Q.     You don't know of any such programmer

24  currently being on the staff, do you?

25  A.     Not on ours.

KEVIS FOLEY

221

1  Q.      Does a reasonable public charity or its

2  donors have any less reason to be concerned than you

3  do about the State of California's policy with

4  respect to Schedule B's and public charities?

5          MS. GORDON:  Objection, vague.

6          THE WITNESS:  I'm not sure what you want my

7  opinion on, whether they should be -- I don't think

8  they should be worried, but...

9  Q.      MR. SHAFFER:  Do they have any less reason to

10  be worried than you do?

11  A.      Less reason?  Oh, probably.  I mean, yes.  I

12  don't have a charity.  So...

13  Q.      No, you don't understand my question.

14  A.      I guess not.

15  Q.      Okay.  You said that you're concerned,

16  somewhat concerned about what we've seen today.

17  A.      Yes.

18  Q.      Do they have any less reason to be somewhat

19  concerned about what we've seen today?

20  A.      I don't know because I don't know what their

21  concerns would be.

22  Q.      Let's take one more look --

23  A.      I would assume if they were really concerned

24  and they saw the information out there they would

25  have said something to us.

# EXHIBIT 2

1

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION


-------------------------------x

AMERICANS FOR PROSPERITY
FOUNDATION,

          Plaintiff,

     v.

KAMALA HARRIS, in her Official
Capacity as Attorney General of
the State of California,

          Defendant.

-------------------------------x



VIDEOTAPED DEPOSITION OF STEVEN BAUMAN

Los Angeles, California

October 29, 2015

9:41 a.m.




Reported by:
Kristi Caruthers, CLR, CSR 10560
Job No: 41445

STEVEN BAUMAN

2

1

2          Steven Bauman

3          October 29, 2015

4          9:41 a.m.

5

6          Videotaped Deposition of STEVEN

7     BAUMAN, held at the offices of

8     Quinn, Emanuel, Urquhart & Sullivan

9     LLP, 865 South Figueroa, 10th Floor,

10    Los Angeles, California, pursuant to

11    notice, before Kristi Caruthers, CLR,

12    CSR Number 10560.

13

14

15

16

17

18

19

20

21

22

23

24

25

STEVEN BAUMAN

3

1                         A P P E A R A N C E S

2

3      FOR THE PLAINTIFF AMERICANS FOR PROSPERITY

4      FOUNDATION:

5           QUINN EMANUEL URQUHART & SULLIVAN, LLP

6           777 6th Street NW, 11th Floor

7           Washington, DC  20001

8           202.538.8000

9           BY:  KEITH H. FORST, ESQ.

10               keithforst@quinnemanuel.com

11               SEAN DELPHEY, ESQ.

12               seandelphey@quinnemanuel.com

13

14     FOR THE DEFENDANT ATTORNEY GENERAL KAMALA D.

15     HARRIS:

16          DEPARTMENT OF JUSTICE

17          OFFICE OF THE ATTORNEY GENERAL

18          CIVIL DIVISION

19          GOVERNMENT LAW SECTION

20          1300 I Street

21          Sacramento, California

22          916.322.6114

23          BY:  KEVIN A. CALIA, ESQ.

24               kevin.calia@doj.ca.gov

25

STEVEN BAUMAN

4

```
 1              A P P E A R A N C E S

 2

 3     FOR THE DEFENDANT ATTORNEY GENERAL KAMALA D.

 4     HARRIS:

 5        DEPARTMENT OF JUSTICE

 6        OFFICE OF THE ATTORNEY GENERAL

 7        DEPUTY ATTORNEY GENERAL

 8        300 South Spring Street

 9        Suite 1702

10        Los Angeles, California  90013

11        213.897.5677

12        BY:  KIM L. NGUYEN, ESQ.

13             kim.nguyen@doj.ca.gov

14         -- AND --

15        DEPARTMENT OF JUSTICE

16        OFFICE OF ATTORNEY GENERAL

17        455 Golden Gate Avenue

18        Suite, 1100

19        San Francisco, California  94102-7004

20        415.703.1577

21        BY:  ALEXANDRA ROBERT GORDON, ESQ.

22             alexandra.robertgordon@doj.ca.gov

23        (Telephonic Appearance)

24

25
```

STEVEN BAUMAN

5

1                      A P P E A R A N C E S

2

3      ALSO PRESENT:

4         Scott McNair, Videographer

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STEVEN BAUMAN

33

1    again:  What do you mean by that?

2           A.   There are certain transactions that

3    charities are required to give us either notice or

4    get our approval if they enter into this type of

5    transaction.

6           Q.   And can you give me an example of

7    those types of transactions?

8           A.   Mergers, sale of all or

9    substantially all assets, conversions, amendments,

10   dissolution.

11          Q.   And so the charity submits some

12   information about it and then you kick off

13   something.  I guess they're looking for your stamp

14   of approval about what they're planning to do is

15   A-OK by your standards?

16          A.   Yes.

17               MR. CALIA:  Objection; vague as to

18   "your."

19   BY MR. FORST:

20          Q.   And that again ranges on an annual

21   basis?  I've multiplied out 36 to 120, which is on

22   a slow month, three, on a busy month, about ten?

23          A.   Yes.

24          Q.   Okay.  Did those transactions also

25   include self-dealing or potential self-dealing

STEVEN BAUMAN

34

1   transactions with directors or officers?

2           A.   We do get those occasionally.  It's

3   pretty rare.

4           Q.   Okay.  So, then, separate and apart

5   from the index transactions, you talked about

6   other cases or investigations that your team

7   performs in L.A.; right?

8           A.   Yes.

9           Q.   And that was two to three a month?

10          A.   Correct.

11          Q.   Okay.  And how would you -- how are

12  those different than index transactions?

13          A.   We will open up a case.  There will

14  be a reason we're opening up a case, and depending

15  on that reason, we will be requesting certain

16  documents of the charity or start doing an

17  investigation, look them up on the Internet, do

18  research that way, maybe talk to people.

19          Q.   Okay.  So, again, if I multiply

20  those out, then if you do roughly 36 a year over

21  the last decade, ten years, that's about 360

22  investigations and/or cases; correct?

23          A.   That are being assigned.

24          Q.   Right.  And out of those 360, your

25  team identified five that implicated Schedule B at

STEVEN BAUMAN

35

1    some point along the way?

2          A.   They identified five that, upon

3    looking at, they weren't able to recall a

4    schedule -- the use of Schedule B.

5               Going back to 2005, though, we

6    don't document when we use Schedule B or any of

7    the other schedules of 990 -- attached to the 990.

8    So that's why the ones -- examples that you have

9    are pretty much all current.

10         Q.   They're all recent examples?

11         A.   Yes.

12         Q.   And so how recent are they?

13         A.   Last year or two.

14         Q.   But to be clear, you gave this

15   specific instruction and you yourself said, "Think

16   back to 2005 and identify anything that" -- "in

17   which you guys remember, recall or there's a

18   record of using Schedule B in connection with your

19   investigation"?

20         A.   "Here are the cases that have been

21   assigned since 2005.  Take a look at those, and do

22   you recall any specific use of Schedule B."

23         Q.   Okay.  Now, of the cases that were

24   assigned to you and/or your colleagues, roughly

25   the five, how many of those was Schedule B the

STEVEN BAUMAN

36

1     impetus or the genesis or the originated document

2     that clued you in to an investigation needs to

3     take place?

4              A.    To make sure I understand, you're

5     asking how many of those was Schedule B the reason

6     we kicked off the investigation.

7              Q.    Said even better.  That's exactly

8     what I'm asking.

9              A.    I don't believe any of them.

10             Q.    In how many of those five

11    investigations did you guys have the Schedule B in

12    unredacted form without having to ask for it from

13    either the charity themselves or the IRS?

14             A.    I don't know.

15             Q.    Could you figure that out?

16             A.    I would have to go talk to the

17    auditors.  I believe -- yeah, I don't recall.

18             Q.    Of the five that were identified

19    from your group, how many did you specifically

20    identify?

21             A.    One.

22             Q.    So in that instance, was the

23    Schedule B the reason you kicked off the

24    investigation?

25             A.    It was not.

STEVEN BAUMAN

37

1      Q.   And in that case, did you have the

2  Schedule B, or could you have gotten the

3  Schedule B from the registrar without having to

4  ask the charity or subpoena the charity for it?

5      A.   I don't -- I don't recall asking

6  the charity for Schedule B, so we must have

7  already had it.

8      Q.   Are you able to obtain unredacted

9  Schedule Bs from the IRS directly?

10     A.   No.

11     Q.   No?

12     A.   No.

13     Q.   Why does that make you chuckle?

14  I'm just curious.

15     A.   It's been my experience that I

16  can't get anything from the IRS.

17     (Whereupon, Bauman Exhibit 2 was

18     marked for identification by the

19     deposition reporter and is attached

20     hereto.)

21  BY MR. FORST:

22     Q.   Mr. Bauman, what's in front of you

23  has been marked Exhibit Number 2.

24     Do you recognize this document?

25     A.   Yes.

STEVEN BAUMAN

44

1    perhaps?

2            A.    Correct.

3            Q.    And any increased responsibilities

4    in connection with that?

5            A.    Working more cases under the

6    supervision of General Auditor IIIs.

7            Q.    Got it.  And by "cases," those are

8    separate and apart from the index transactions?

9            A.    Yes.

10           Q.    Okay.  And how long were you a

11   GA-II?

12           A.    Approximately three years.

13           Q.    Okay.  And remind me -- I'm not

14   going to walk through it all -- when did you

15   become the supervisor, the current position that

16   you have?

17           A.    2001.

18           Q.    2001.  And what was your title in

19   the year 2000, if you remember?

20           A.    Investigative Auditor III.

21           Q.    Okay.  Do you have an understanding

22   when the IRS first created Schedule B and started

23   mandating that charities fill it out and file it

24   with the IRS?

25           A.    Only based on something you said

STEVEN BAUMAN

45

1    earlier, 2000.

2              Q.    Okay.  But you have no independent

3    understanding of that?

4              A.    No.

5              Q.    When did you first become aware

6    of -- if you weren't aware of Schedule B in 2000,

7    when did you first become aware of Schedule B,

8    generally?

9              A.    I don't know that I could really

10   answer that in that we review the 990 as a whole

11   and all of the schedules attached to it.  The

12   first time I actually saw a Schedule B and it was

13   an issue, I really don't know.

14             Q.    Okay.  Was this declaration dated

15   January 20, 2015 the first time that you ever put

16   down on paper and memorialized the utility and use

17   of Schedule B within your group?

18             A.    There were drafts in another

19   declaration that I did.  I don't recall if that

20   came before or after this one.

21             Q.    Well, if they came after, then --

22   oh, drafts of this declaration; is that what

23   you're referring to?

24             A.    Yes.

25             Q.    Okay.  So let me frame it this way,

STEVEN BAUMAN

46

1   then:  Besides this writing process associated

2   with this declaration, had you ever written down

3   or memorialized the utility and use of Schedule B

4   in your work as an investigative auditor?

5           A.   No.

6           Q.   Were you aware throughout the

7   course of your employment between 2000 and 2015

8   that most charities didn't file unredacted

9   Schedule Bs in California?

10          MR. CALIA:  Objection; lacks

11  foundation.

12          THE DEPONENT:  I am aware that

13  there are many charities that don't.  I haven't

14  really sat down to try to -- or ever thought about

15  quantifying what percentage or most don't or most

16  do.

17  BY MR. FORST:

18          Q.   Okay.  But how are you aware of it?

19          A.   When I'm reviewing the 990s, I'll

20  see it in some and I don't see it in all.

21          Q.   Okay.  And you've been reviewing

22  990s since the year 2000, at least; right?

23          A.   Yes.

24          Q.   Okay.  In the year 2000, do you

25  ever remember speaking to a DAG, the attorney

STEVEN BAUMAN

47

1   general, anyone else, saying, "You know what?  We

2   need to go make sure that every charity is filing

3   their Schedule B in unredacted form"?

4              A.   No.

5              Q.   Okay.  Did you do that in 2001?

6              A.   No.

7              Q.   Did you ever do that between the

8   years 2001 and 2005?

9              A.   Approach a DAG and say we have to

10  make sure that every -- I have not.

11             Q.   Okay.  Have you ever done it?

12             A.   Have I ever asked a DAG that we

13  need to make sure that every charity is --

14             (Counsel nodded.)

15                  THE DEPONENT:  No.

16  BY MR. FORST:

17             Q.   Okay, meaning -- this talks about

18  the Schedule B providing critically important

19  information; right?

20             A.   It talks about the 990 and all the

21  attached schedules providing critical information.

22             Q.   Okay.  So you don't think the

23  Schedule B provides critical information?

24                  MR. CALIA:  Objection; misstates

25  testimony, argumentative.

STEVEN BAUMAN

48

1        THE DEPONENT:  I do think

2    Schedule B provides critical information in some

3    cases.

4    BY MR. FORST:

5        Q.    In some cases, okay.

6            But then it's fair to say

7    Schedule B is just one investigative tool that you

8    use among a wealth of documents and other

9    resources when investigating a charity?

10           MR. CALIA:  Objection; vague.

11           THE DEPONENT:  I'm more comfortable

12   saying it's one of the tools that we use.  I don't

13   know that I want to -- about wealth of.

14   BY MR. FORST:

15       Q.    Okay.  But you felt, at least in

16   the years 2000, 2001, 2002, that you could perform

17   your audits conscientiously and with due diligence

18   without having unredacted Schedule Bs; right?

19           MR. CALIA:  Objection; misstates

20   testimony.

21           THE DEPONENT:  The answer to that

22   would be on a case-by-case basis.  There are times

23   that we're looking at revenue to an organization

24   and Schedule Bs would -- are helpful.

25   ///

STEVEN BAUMAN

107

1    if -- or hard for you to detect interested

2    transactions or self-dealing or other things;

3    right?

4            A.   My understanding of your question

5    was if it's on Schedule B won't it be elsewhere,

6    and what I'm trying to say is not necessarily, and

7    that not necessarily may be intentionally or

8    otherwise.

9            Q.   Okay.  Again, but you're not

10   thinking of an example as you sit there and you

11   say that where if something was on Schedule B that

12   contradicted information in other places and it

13   wasn't until you looked at Schedule B that you

14   figured it out?

15           A.   Not that I recall.

16           Q.   Okay.  So then going back to what

17   we were talking about, charities have to disclose

18   interested transactions not only between officers,

19   directors, key employees, but also between key

20   contributors and their family members; right?

21           A.   I'm not -- I know they have to

22   disclose the self-dealing between officers,

23   directors, family members.  I know they have to

24   disclose between donors.  I'm not sure about the

25   donors' families.

STEVEN BAUMAN

108

1  Q.  You don't know one way or the
2  other?
3  A.  Correct.
4  Q.  Okay.  We'll look at a schedule in
5  a little bit.  Maybe that will clear it up.
6  But in any event, the point I'm
7  making is:  Interested transactions between donors
8  and a charity are reflected in other places
9  besides Schedule B; in fact, that's not what
10  Schedule B is even about; right?
11  A.  Schedule B is not about reporting
12  self-dealing transactions.
13  Q.  Right.
14  A.  Right.
15  Q.  That comes from other places;
16  correct?
17  A.  That comes from other places.
18  Q.  Okay.  And so if you have a
19  complaint and you have that information, couldn't
20  you again say, "We have an instance here where we
21  have some concerns about self-dealing, about
22  transactions.  I have the particular dollar
23  amount.  I know what's going on.  Charity, give me
24  the identity of that particular contributor or
25  person so I can investigate this."

STEVEN BAUMAN

109

1    You could do that; right?

2        A.   We could do that, but, again, that

3    then raises my -- the concern I would have about

4    that, to be honest, is even bigger than the other

5    scenario we gave, because in this case if we

6    contact the charity and said, "We want the

7    information on this particular donor," that donor

8    in this scenario that we're talking about has his

9    own legal issues now --

10       Q.   Right.

11       A.   -- and is more likely to -- well,

12   will be coached and is less likely to be

13   forthcoming.

14       Q.   Okay.  But, again, that concern is

15   hypothetical; right?  Because I mean in your

16   personal experience, it's never happened to you?

17       A.   Well, but it has happened.

18       Q.   One time.

19       A.   Well, that we are aware of.

20       Q.   Okay.  But one time.

21            And we talked about the hundreds

22   and hundreds of investigations that you do, you're

23   aware of, sitting here today, of one instance?

24       A.   Well, the hundreds and hundreds of

25   investigations that we're talking about are going

STEVEN BAUMAN

125

1        So by the time it gets to us and

2    we're looking at the 990s, we're already involved.

3    I mean there's a reason we're looking at them.

4        Q.   Right.

5        A.   So we don't really go to the

6    registry and say, "There's no Schedule B, go get

7    it."  We would -- if we wanted the Schedule B at

8    that point, we would contact the charity itself.

9        Q.   Okay.  Well, I want to go back to

10   my question because I think it was a little bit

11   different and I just said you've never personally

12   gone to a DAG or the AG, him or herself, and said,

13   "This charity hasn't filed its Schedule B.  We

14   need to go out and get it"?

15       A.   I have.

16       Q.   To a deputy attorney general you've

17   said that?

18       A.   To a DAG, yes.

19       Q.   Okay.  Who?

20       A.   Sandra Barrientos,

21   B-a-r-r-i-e-n-t-o-s.

22       Q.   Okay.  And when was that?

23       A.   Within the last year.

24       Q.   And anytime before that have you

25   done the same thing?

STEVEN BAUMAN

126

1          A.    Not to my recollection.

2          Q.    You said something in your earlier

3     answer where you said that by the time you get

4     involved, it's already -- an issue's come to you

5     and been flagged, et cetera; right?

6          A.    Yes.

7          Q.    Your declaration says that the

8     Form 990 in totality, including Schedule B,

9     provide critical information for auditing and

10    investigating charities; right?

11         A.    Yes.

12         Q.    Okay.  Have you ever, before

13    something's come to you, said just that to the

14    registry:  "In order for us to do our job

15    effectively, you need to be making sure that

16    you're getting the entire form and every schedule

17    before it comes to us, or else we can't do as good

18    of a job as we otherwise might be able to do"?

19         A.    I have not had that conversation.

20         Q.    Okay.  Has anything prevented you

21    from having that conversation?

22         A.    No.

23         Q.    Under what circumstances can you

24    access -- well, you understand that a Schedule B

25    that includes names and addresses is, quote,

STEVEN BAUMAN

127

1    unquote, "a confidential document" within the

2    registry; right?

3              A.    Yes.

4              Q.    It's not made available for public

5    consumption through the website?

6              A.    Correct.

7              Q.    Okay.  So in what scenario can you

8    go access a confidential Schedule B if you want to

9    see it or need it?

10              A.    The registry keeps a database that

11   we have access to called -- we call it MyLicense

12   Office, and they keep public records and

13   confidential records on there and we can log in

14   and see what's in there.

15              Q.    Okay.  What was that called again,

16   I'm sorry, the database?

17              A.    MyLicense Office.

18              Q.    MyLicense Office?

19              A.    And I believe that's with the

20   acronym -- we call it MLO.

21              Q.    MILO?

22              A.    MLO, M-L-O.

23              Q.    Thank you.

24                    And that, to your understanding, is

25   separate and apart from the database that's

STEVEN BAUMAN

165

1   improper interested transactions with donors or

2   their family members, all I'm saying is, one place

3   you could go look to find that information is

4   Schedule L.

5           A.   My concern in the question is this

6   would disclose the transaction between a charity

7   and the money going out to the interested party.

8               I don't know that by looking at

9   this by itself would give us an indication that

10  the donor is really connected to this party, the

11  recipient.

12          Q.   Okay.  So what you're saying is, "I

13  see here if the charity is saying they're giving

14  money to some entity; what I don't know is whether

15  that entity is also affiliated with a donor on

16  Schedule B"?

17          A.   Correct.

18          Q.   Okay.  What I'm asking, though, is

19  if there's a transaction here that jumps out at

20  you to say, "I need to look at this transaction

21  further," you don't need to know the identity of

22  every donor listed on Schedule B to the extent a

23  charity lists 5,000-plus donors.

24              You don't need to know everybody;

25  right?

STEVEN BAUMAN

166

1       A.    We don't need to know everybody.

2       Q.    In fact, you might only need to

3   know one person on that entire list?

4       A.    Part of the problem is that we

5   don't know what we need to know until we know what

6   we need to know.

7       Q.    Well --

8       A.    So I mean whether there's one or a

9   hundred people on Schedule B, just -- I mean

10  looking at this in and of itself, the fact that,

11  you know, there are names listed on here, I don't

12  know if that by itself is going to really raise an

13  awful lot of red flags.

14      Q.    Right.  But what's not going to

15  raise flags in and of itself about an interested

16  party loan is Schedule B.  That's not even about

17  interested party loans or transactions or

18  anything --

19      A.    Correct.

20      Q.    -- right?  But if there is a red

21  flag being raised that causes you to look into it,

22  Schedule B isn't the triggering document for that?

23      A.    It could be the triggering document

24  in conjunction with, for example, Schedule L.

25      Q.    Okay.  But, again, to the extent

STEVEN BAUMAN

167

1    that you recall or you went back and you looked

2    at, you know, ProLaw records, Schedule B has never

3    been that triggering document that kicked off an

4    investigation?

5              A.   Not that I recall.

6              Q.   Okay.  And so just what I'm driving

7    at, you understand a little bit in this case is

8    it's a balancing test:  How much do you need that

9    information relative to the anonymity and the

10   desire of donors not to be identified; right?

11             Do you understand that?

12             MR. CALIA:  Objection; calls for a

13   legal conclusion.

14             THE DEPONENT:  I understand your

15   argument.

16   BY MR. FORST:

17             Q.   Well, it's not really an argument.

18             I'm saying:  Do you understand why

19   you gave the declaration that you gave in this

20   case?

21             A.   Yes.

22             Q.   Okay.  And why was that?

23             A.   Because your clients want to

24   withhold their identity on Schedule B in

25   disclosing it to our office.

STEVEN BAUMAN

168

1         Q.   Right.  And do you know why?

2         A.   Well, I assume because they're

3  concerned that there's some harm that may come to

4  them.

5         Q.   Okay.  So then the question is

6  whether does the benefit of having this

7  information on your side outweigh the potential

8  risk or harm from disclosure on the other side;

9  fair?

10           MR. CALIA:  Objection; calls for a

11  legal conclusion.

12           THE DEPONENT:  If you're asking me

13  if there's a balancing act there, I understand the

14  argument that there is, your argument.  I don't

15  personally buy it.

16  BY MR. FORST:

17         Q.   You don't personally buy it.  Okay,

18  fine.

19           But I'm saying -- I'm not asking

20  for a legal; I'm just saying that has to make

21  sense.

22           As a reasonable minded, bright

23  person sitting there, you understand the tension;

24  right?

25           MR. CALIA:  Objection;

STEVEN BAUMAN

247

1          Q.   Right.  Then, conceivably, you

2     could have a Schedule B with nobody for a

3     perfectly legitimate charity?

4          A.   Yes.

5          Q.   So I guess that in and of itself

6     isn't all that telling; right?

7          A.   The fact that there is a Schedule B

8     with nothing reported on it by itself may not

9     necessarily be all that telling.

10         Q.   Right.  So do you know whether

11    these charities checked the box that said they

12    were filing -- they needed to submit a Schedule B;

13    that they were receiving funds from, let's say,

14    the special exception 33 percent rule?

15         A.   I do not know.

16         Q.   Again, going back, do you know what

17    triggered this investigation?

18         A.   No.

19         Q.   Okay.  For any of these, do you

20    know whether it was necessary to consult the

21    Schedule B in order to successfully complete the

22    audit?

23         A.   I'm not really sure I understand

24    the question in that we use Schedule B in various

25    ways and assisted in completing the audit, and if

STEVEN BAUMAN

248

1    you're asking me if you had taken away the

2    Schedule B if that would have stopped us from

3    doing the audit, I don't know that it would have

4    stopped us.  We would have continued to work, and

5    whether we were able to connect the dots

6    otherwise, I -- I don't know how to answer that.

7    Maybe, maybe not.

8              Q.   What about the one you worked on,

9    Number 7, this one where Schedule B confirmed that

10   donations were coming from the public, which I

11   think again, by definition, that's what Schedule B

12   means.

13             A.   We probably could have completed

14   that without it.

15             Q.   Okay.  Are you ever aware of an

16   investigation that your team or you have done

17   where, upon consultation of the Schedule B, that

18   resolved the need or resolved the investigation?

19             In other words, you looked at the

20   Schedule B and that told you, "You know what?

21   There's nothing here.  We don't need to continue

22   with an audit or an enforcement action"?

23             A.   Would looking at Schedule B stopped

24   us from doing an investigation.  Are you asking me

25   if that's possible it could have happened, or am I

STEVEN BAUMAN

249

1   aware --

2            Q.   Are you aware.

3            A.   -- of any specific cases?

4                 No, I'm not aware of it.

5                 MR. FORST:  Okay.  Last one.  This

6   is 12?

7                 DEPOSITION REPORTER:  Yes.

8                 (Whereupon, Bauman Exhibit 12 was

9                 marked for identification by the

10                deposition reporter and is attached

11                hereto.)

12  BY MR. FORST:

13           Q.   Mr. Bauman, Exhibit Number 12 looks

14  like an E-mail from Mr. Hugh Jones on May 29th,

15  2014 to the Listserv charity with the number

16  2@ftc.gov, of which you are included underneath

17  that as a recipient on that list, sir.

18                Do you recognize this E-mail?

19           A.   No.

20           Q.   You don't recall receiving it?

21           A.   I don't read all the Charity 2

22  E-mails that I get.

23           Q.   Do you filter them to a junk

24  folder?

25           A.   I don't read all of the charity --

STEVEN BAUMAN

250

1    I do not filter them to a --

2            Q.   I see.

3            A.   -- a junk folder, but I don't read

4    very many of them.

5            Q.   Now, do they come every day?  Is it

6    routine that you'll get one or more E-mails

7    through this Listserv on a daily basis?

8            A.   Yes.

9            Q.   It is?

10           A.   Yes.

11           Q.   And how many, generally?

12           A.   Generally, I would say -- I don't

13   know, three a day.  Could be more on a busy day.

14           Q.   Do you ever send anything out via

15   this Listserv?

16           A.   I believe probably about five years

17   ago I think I sent one.

18           Q.   Okay.  So this is not a Listserv

19   that you actively participate in?

20           A.   It is not.

21           Q.   Okay.  And what's the purpose of

22   it, this E-mail Listserv?  Why do you guys have

23   it?

24           A.   It was set up for other attorney

25   generals or entities that regulate charities in